Jayden VEIL, Plaintiff,

v.

VITEK, INC., a Texas corporation and E.I. du Pont de Nemours and Company, a Delaware corporation, Defendants.

Gary BRACHT, Plaintiff,

v.

VITEK, INC., a Texas corporation and E.I. du Pont de Nemours and Company, a Delaware corporation, Defendants.

Tammie L. KLEIN, Plaintiff,

v.

VITEK, INC., a Texas corporation and E.I. du Pont de Nemours and Company, a Delaware corporation, Defendants.

Civ. A. Nos. A3–90–197, A3–91–112 and A3–91–114.

United States District Court, D. North Dakota, Southeastern Division.

Sept. 18, 1992.

**230**

Ronald Goldser, Zimmerman & Reed, Minneapolis, Minn., Steven C. Schneider, Schneider, Schneider & Schneider, Fargo, N.D., for plaintiffs.

John D. Kelly, Harlan G. Fugelstad, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., Thomas Klinkel, Barry Fish, Michael Miller, Edward M. Mansfield, Lewis & Roca, Phoenix, Ariz., for defendants.

## MEMORANDUM AND ORDER

BENSON, Senior District Judge.

In the above captioned cases three separate plaintiffs have brought personal injury actions against defendants Vitek, Inc. (Vitek) and E.I. duPont de Nemours and Company (DuPont). Defendant Vitek is a bankrupt Texas Corporation that has not entered an appearance. The three cases against DuPont are hereby consolidated for disposition.

## FACTUAL BACKGROUND

Each plaintiff is a recipient of defendant Vitek's Proplast (TMJ) Implant. The implant was designed by Vitek for use in the human jaw as a replacement for the cartilage disc in the temporomandibular joint. Vitek manufactured this implant utilizing a substance under its trademark, proplast. Proplast is a material made with polytetrafluoroethylene (PTFE) and other substances.[1] Defendant DuPont, and others, formulate PTFE. DuPont's PTFE is trademarked as teflon. For purposes of this Memorandum and Order the court will assume that Vitek purchased PTFE exclusively from DuPont.[2]

Defendant has filed a Fed.R.Civ.P. 56 motion for summary judgment on the issue of duty (Doc. # 12). Summary Judgment is available to a party when a review of the pleadings and other documents filed indicate there exists no genuine issue of material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A Court considering a motion for summary judgment must view the evidence in a light most favorable to the non-moving party. The non-moving party is entitled to all reason-

---

1. Vitek's proplast material, the formulation of which involves a complex process, is a registered patent obtained by Charles Homsy, Vitek's president. *See* Brief in Opposition to the Motion for Summary Judgment (Doc. # 15) exhibit K (U.S. Patent No. 3992725). The steps involved in making proplast include:

   1) Mixing: the polymer and carbon and soluble ingredients are mixed in a high speed mixer suspended in a soluble organic solvent.
   2) Filtration: the mixed slurry is then vacuum filtered.
   3) Compression: the filter cakes from step 2 are compressed at levels between 50 and 3000 pounds per square inch.
   4) Rolling: the filter cake is then run through the nip of heated rolls.
   5) Drying: the stock material is then dried to evaporate any residual solvent.
   6) Sintering: dried stock is then sintered in a heated press at temperatures between 610 F. and 680 F. and pressure between 50 to 5800 pounds.
   7) Leaching: stock is then leached so as to dissolve out the water soluble filler material.
   8) Drying: the stock is then dried in an oven.

2. In oral arguments before the court on Dupont's motion for summary judgment, Dupont indicated that Vitek's source of its' PTFE is a contested issue.

able inferences that can be drawn from the evidence. *Vacca v. Viacom Broadcasting of Missouri, Inc.*, 875 F.2d 1337, 1339 (8th Cir.1989).[3]

## DISCUSSION

Plaintiffs' complaint (Doc. #1) alleges causes of action based on negligence, strict liability, breach of warranty and misrepresentation. Under the negligence and strict liability theory, plaintiffs allege that DuPont breached a duty to warn of the dangers associated with Vitek's proplast implant.

Defendant DuPont contends that, "as a bulk material supplier to a medical device manufacturer of an FDA-regulated medical device, DuPont had no duty to assure the safety of the Proplast TMJ Implant designed, manufactured, tested and sold by Vitek." DuPont seeks summary judgment on all of plaintiffs' claims. DuPont's Motion for Summary Judgment on the issue of Duty (Doc. #12) at 2.

Plaintiffs have framed the question of duty as it relates to defendant DuPont's summary judgment motion somewhat differently:

> The issue then, is whether DuPont, as the sole supplier of the PTFE that went into proplast and ultimately failed, ... should be held responsible for such injuries, where it knew that Vitek intended to use the PTFE in a joint, knew that such use was certain to cause tragic consequences, and yet kept that information secret and failed to warn anybody of the terrible consequences.

Brief in Opposition to the Motion for Summary Judgment (Doc. #15) at 4.

It appears to be undisputed that as long ago as 1967, DuPont was aware of certain studies questioning the propriety of using PTFE in medical implants. The record also indicates that DuPont expressed these concerns to Vitek founder and President, and, former DuPont employee, Charles Homsy. On March 13, 1967, George A. Wilkens, a Consultant in DuPont's Technical Services Laboratory, sent a letter to Mr. C. Gonzalez, a purchasing agent at Methodist Hospital in Houston Texas where Charles Homsy was then the Coordinator for Development of Prosthetic Devices. The letter was in response to the Hospital's purchase order for an amount of teflon to be used by the Hospital in a medical application. Memorandum in Opposition to the Motion for Summary Judgment By Defendant E.I. DuPont de Nemours (Doc. #15) Appendix N. The letter informed Gonzalez that teflon was not made for medical purposes, that DuPont did not conduct the detailed long-time tests required to evaluate whether PTFE would be appropriate for use in medical devices and that results from tests performed in the United States and Germany had been unfavorable.

On March 20, 1967, Charles Homsy personally responded to Wilkens March 13, 1967 letter, Homsy claimed that the reports to which DuPont had directed the Hospital's attention were "crucially incomplete and not applicable to his intended application" and cited to more recent studies which allegedly concluded from long-time tests that medical applications of TFE poly-

---

**3.** The Eighth Circuit has recently outlined summary judgment procedure as follows:

> Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.' In designating specific facts, 'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment' because Rule 56(c) requires 'that there be no *genuine* issue of *material* fact.' In order to determine which facts are material, courts should look to the substantive law in a dispute and identi-

fy the facts which are critical to the outcome. A dispute about a material fact is genuine if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment. In performing the genuineness inquiry, trial courts should believe the evidence of the party opposing summary judgment and all justifiable inferences should be drawn in that party's favor. A court is not to 'weigh the evidence and determine the truth of the matter but [instead should] determine whether there is a genuine issue for trial.'

*Commercial Union Insurance Co., v. Schmidt,* 967 F.2d 270, 271–272 (8th Cir.1992) (citations omitted) (emphasis in the original).

mers "produce less tissue reaction than all other plastics commonly used in modern surgery." Memorandum in Opposition to Motion for Summary Judgment By Defendant E.I. DuPont de Nemours (Doc. # 15) Appendix O.

Plaintiffs have characterized DuPont as having conclusive knowledge of the consequences of using PTFE in a medical device application such as the Vitek (TMJ) implant. While the record shows that DuPont expressed concern about Vitek's application of DuPont's teflon, plaintiffs have cited no admissible evidence supporting its contention that DuPont concealed independent conclusive knowledge of the impropriety of using PTFE in a medical application such as Vitek's (TMJ) implant. Contrary to plaintiffs' assertions, a review of the correspondence between the parties indicates DuPont's concern, because of its lack of knowledge on the subject, with Vitek's use of teflon in medical devices.

Once the motion for summary judgment is made, an affirmative duty is placed upon the opposing party to establish by affidavit, or otherwise designate specific facts within the record, which would establish a genuine issue for trial. *Commercial Union Insurance Co. v. Schmidt*, 967 F.2d 270, 271–272 (8th Cir.1992). As it relates to the issue of DuPont's knowledge of the impropriety of using teflon in the construction of a medical device, the plaintiffs have not met this affirmative burden.

The court takes judicial notice of the Food and Drug Administration (FDA) proposed rules on general and plastic surgery devices. In a lengthy comment, specifically approving PTFE with carbon fibers as a medical device, the FDA stated in part:

> FDA agrees with the recommendation of both Panels and is proposing that polytetrafluoroethylene [PTFE] with carbon fibers composite implant material be classified into class II (performance standards). Although the device is an implant, the agency believes that pre-market approval is not necessary because there is sufficient information available to establish a performance standard that would provide reasonable assurance of the safety and effectiveness of the device.

47 Fed.Reg. 2819 (1982) (proposed Jan. 19, 1982). From these proposed rules and the FDA's subsequent approval[4] of the proplast material, it can be concluded that the FDA was satisfied that PTFE with carbon fibers was safe for use in medical implants.

Federal law, as administered by the FDA, requires that medical device manufacturers assure that adequate valid scientific evidence exists to provide reasonable assurance that medical devices are safe and effective for their intended use. 21 C.F.R. § 860.7(g)(1). Section 860.7(g)(1) states in pertinent part;

> It is the responsibility of each *manufacturer* and importer of a device to assure that adequate, valid scientific evidence exists and to furnish such evidence to the Food and Drug Administration to provide reasonable assurance that the device is safe and effective for its intended uses and conditions of use....

*Id.* (emphasis added). The plain language of section 860.7(g)(1) indicates intent to place upon the *manufacturer* of a medical device the obligation of assuring the existence of valid scientific evidence so that the FDA can provide reasonable assurance of a device's safety and effectiveness.[5] Clearly, the entity responsible for overseeing and insuring the safety of medical devices such as the Vitek (TMJ) implant is the Food and Drug Administration.[6]

---

**4.** The proposed rules were finalized on June 24, 1988. General and Plastic Surgery Devices; General Provisions and Classifications of 51 Devices, 53 Fed.Reg. 23856–01 (1988) (codified at 21 C.F.R. § 878).

**5.** As an example of a case involving the application by the FDA of 21 C.F.R. § 860 *see, General Medical Co. v. U.S. Food and Drug Admin.*, 770 F.2d 214 (D.C.Cir., 1985) (medical company's petition for reclassification denied based on FDA's authority to require showing of safety and effectiveness before conceding device did not present unreasonable risk of illness or injury).

**6.** The legislative history of the Medical Device Amendments of 1976 provides in part as follows:

From a review of the numerous appendices, affidavits, depositions and exhibits submitted by the parties, the court concludes there is nothing in the record currently before the court from which a jury could find that DuPont had conclusive knowledge that teflon would be inappropriate for use in the Vitek proplast implant.

The remaining issue is whether DuPont as a supplier of bulk raw material to a FDA regulated medical device manufacturer is legally accountable to the plaintiffs on any of their alleged theories of recovery.

Failure to Warn

■ Negligent failure to warn cases have their genesis in Restatement (Second) of Torts § 388 (1965) which provides as follows;

**§ 388. Chattel Known to be Dangerous for Intended Use**

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of the dangerous condition or of the facts which make it likely to be dangerous.

*Id.* The North Dakota Supreme Court has cited this section of the restatement in recognizing a cause of action based on negligent failure to warn. *Barsness v. Gener-*

*al Diesel & Equipment Co.,* 383 N.W.2d 840 (N.D.1986); *Olson v. A.W. Chesterton Co.,* 256 N.W.2d 530 (N.D.1977); *Seibel v. Symons Corp.,* 221 N.W.2d 50 (N.D.1974).

The *Olson* and *Seibel* decisions involved defendants that were the manufacturers of an alleged defective product. [In the action now before this court, however, plaintiffs seek to impose upon a defendant that was not the manufacturer of the final product, a duty to provide the requisite warning. This is not novel.] In *Barsness,* the application of section 388 was held to encompass those defendants who supply chattels in addition to those who manufacture them. *Barsness,* 383 N.W.2d at 845.

In the within action, however, plaintiffs seek to impose a duty to warn upon a party that provided a substance to a manufacturer that was used by the manufacturer in the formulation and construction of a medical prothesis that was regulated and approved by the Food and Drug Administration (FDA). The court has found no authority for classifying a supplier of bulk raw material as a "supplier of chattels" within the meaning of section 388 of the restatement.

In the context of plaintiffs strict product liability cause of action, based on a failure to warn, the court notes that North Dakota expressly adopted Restatement (Second) of Torts § 402A in *Johnson v. American Motors Corporation,* 225 N.W.2d 57, 66 (N.D. 1974). Section 402A provides;

**§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer**

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

These devices hold the promise of improving the health and longevity of the American people. The Committee wants to encourage their research and development. *The Committee also wants to be sure that the FDA has the proper authority to regulate that process so*

*that Americans are not put at risk from the use of unsafe and ineffective medical devices.* S.Rep. No. 94–33, 94th Cong., 2d Sess. 2 (1976), *reprinted in* 1976 U.S.C.C.A.N. 1070–71 (emphasis added).

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965).[7]

The court notes North Dakota precedent preserving the distinction between a failure to warn based on negligence and a failure to warn based on strict liability. *See Butz v. Werner*, 438 N.W.2d 509, 513 (N.D.1989) (strict liability and negligence claims based on failure to warn are treated separately). There has, however, been much written on whether there is a practical difference between these two theories of recovery. The consensus is that there is no significant practical difference between the theories. *Kelly v. Crown Equipment Company*, 970 F.2d 1273, 1277 (3rd Cir.1992); *Mazur v. Merck & Co., Inc.*, 964 F.2d 1348, 1354 (3rd Cir.1992); *Little v. Liquid Air Corp.*, 952 F.2d 841, 853 (5th Cir.1992) (Garwood, J., dissenting); *DiPalma v. Westinghouse Electric Corp.*, 938 F.2d 1463, 1466 (1st Cir.1991); *See also* Prosser and Keeton on Torts (5th ed. 1984) § 99 at 697 (stating that a cause of action in strict liability for failure to warn is really nothing more then negligence). For purposes of this motion, the court concludes there is no significant difference between the theories and will consider both claims together.

In *Andersen v. Teamsters Local 116 Bldg. Club*, 347 N.W.2d 309, 311 (N.D. 1984), the North Dakota Supreme Court framed the "duty to warn" as follows:

A seller or manufacturer of a product may incur liability in two ways. A product is defective within the meaning of products liability if it is unreasonably dangerous to the user or consumer or to his property. A product may also be defective if the manufacturer or seller has reason to anticipate a danger from the use of the product and fails to give an appropriate warning.

The duty to provide appropriate warning may be subdivided into a duty to provide appropriate directions for safe use, both intended and reasonably anticipated, and a duty to warn against dangers inherent with misuse. As we noted in *Seibel*, directions and warnings serve different purposes. Directions promote effective use, warnings promote safe use.

*Andersen*, 347 N.W.2d at 311 (citations omitted).

In the case now before this court it is clear that Dupont did not participate in the design, manufacture, testing, marketing or human implantation of Vitek's proplast (TMJ) implant. Rather DuPont provided PTFE resins and fibers to Vitek. Vitek then used these "raw materials" in the manufacture of it's patented proplast material which was then fashioned into the allegedly faulty prothesis implants.

### Bulk Supplier Doctrine

■ Although not specifically recognized in North Dakota, other jurisdictions have adopted what has become known as the bulk supplier doctrine.[8] This doctrine oper-

---

**7.** It should be noted subsections (2) and (3) of the Caveat to Restatement (Second) of Torts § 402A provides: "The Institute expresses no opinion as to whether the rules stated in this Section may not apply ... (2) to the seller of a product expected to be processed or otherwise substantially changed before it reaches the user or consumer; or (3) to the seller of a component part of a product to be assembled." *Id.*

**8.** *See Smith v. Walter C. Best, Inc.*, 927 F.2d 736 (3rd Cir.1990) (applying Ohio law holding that sellers may shift liability to an intermediary

purchaser if seller gives adequate warning to intermediary); *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563 (11th Cir.1989) (applying Georgia law recognizing the bulk suppliers duty to warn as being satisfied with an adequate warning being given to intermediary distributor); *Donahue v. Phillips Petroleum Co.*, 866 F.2d 1008 (8th Cir.1989) (applying Missouri law recognizing a bulk supplier's duty to warn its immediate purchaser and to see that purchaser is sufficiently appraised of dangerous propensities of product).

ates as a defense to a bulk supplier from the usual obligation to provide the ultimate consumer with requisite warnings of dangers associated with a particular product. *Donahue v. Phillips Petroleum Co.*, 866 F.2d 1008, 1012 (8th Cir.1989). This "defense" requires the,

> bulk supplier to warn it's immediate purchaser 'with the intention that such warning be given [to] the ultimate consumer.' However even a bulk supplier must provide adequate instructions to the distributor next in line or ascertain that the distributor is informed as to the nature of the product and is in a position to convey the information so that the ultimate consumer is apprised of the dangerous propensity of the product.

*Id.* (citations omitted). The logic of the doctrine is apparent. The intermediary is the entity in the better position to provide warning to the ultimate consumer of the dangers associated with a finished product. Considering its broad acceptance, and the soundness of the concept, the court concludes if the question were presented to the North Dakota Supreme Court, it would adopt the principles associated with the bulk supplier doctrine.

Most bulk supplier cases involve bulk suppliers of inherently dangerous chemicals who sell their product to intermediaries.[9] The intermediaries distribute the product to the consuming public. Typically, the bulk supplier is aware of the inherent dangers of its product and is required to provide the information to the intermediary so that the intermediary can provide the consumer with the requisite warning.

The within case is not a typical bulk supplier case. There is no showing that Teflon is inherently defective or dangerous. The alleged danger associated with teflon here is it's use in the manufacture of a prothesis implant.[10] Additionally, as mentioned before, there is no evidence in the record which would show that DuPont had knowledge of the consequences of using teflon in a medical application.

In *George v. Parke–Davis*, 107 Wash.2d 584, 733 P.2d 507 (1987), a case similar to

---

**9.** *See Smith v. Walter C. Best, Inc.*, 927 F.2d 736 (3rd Cir.1990) (seller of sand owed no duty to employee of buyer of sand to warn regarding sand's toxic properties); *Stuckey v. Northern Propane Gas Co.*, 874 F.2d 1563 (11th Cir.1989) (propane gas producer must establish that intermediary was warned or had knowledge of propane gas's propensity to experience odor fade); *Donahue v. Phillips Petroleum Co.*, 866 F.2d 1008 (8th Cir.1989) (suit against manufacturer of odorizing agent for propane gas in which defendant alleged bulk supplier defense); *Manning v. Ashland Oil Co.*, 721 F.2d 192 (7th Cir. 1983) (general discussion of bulk supplier defense in chemical case); *Gifaldi v. Jefferson Chemical Company*, No. 91–CV–677E, 1992 WL 76980 (W.D.N.Y. Mar. 30, 1992) (suit against manufacturer of precursor chemicals used in making foam insulation); *Santiago v. Sherwin Williams Co.*, 782 F.Supp. 186 (D.Mass.1992) (suit against manufacturer of lead pigment contained in lead-based paint); *Sara Lee Corporation v. Homasote Co.*, 719 F.Supp. 417 (D. Mar. 1989) (bulk supplier doctrine shielded manufacturer of expandable polystyrene beads from liability for fire alleged to have spread more rapidly as a result of ceiling containing insulation made from polystyrene beads); *Higgins v. DuPont*, 671 F.Supp. 1055 (D.Mary.1987) (supplier of dangerous chemicals to paint manufacturer not liable to injured persons who came in contact with finished product); *Nigh v. Dow Chemical Co.*, 634 F.Supp. 1513 (W.D.Wis.1986) (under bulk supplier doctrine manufacturer of chemical may be unable to control the packaging and warnings communicated to ultimate consumer and may not be held liable).

**10.** In the context of the duty owed by a component part supplier, the following quote from Prosser appears to be relevant:

> If the failure was due to the fact that the assembled product was unreasonably dangerous because the component part, such as an altimeter for an airplane, was unfit for its ordinary purposes, then quite clearly the component part itself was defective as designed. If, on the other hand, the assembled product was unreasonably dangerous because the component part was unfit for the particular use that the assembler was making of it, then arguably the defect is in the design of the assembled product rather than in the design of the component part.

W. Page Keeton et al., *Prosser and Keeton on Torts* § 101, at 706 (5th ed. 1984).

Conceptually the court notes a significant difference between the bulk supplier of dangerous chemicals and the case at bar. Unlike the chemical case, the duty to warn imposes an obligation upon the supplier to explain to the intermediary the dangerous propensities of the particular chemicals. However, in this case, the warning which need be given would have been that the product was unsafe for use in the human body.

the case herein, plaintiff's mother had taken the drug DES which plaintiff alleged caused her injury. *Id.*, 733 P.2d at 509. The question in *George* was framed by the Washington Supreme Court as; "[I]s a bulk supplier of raw diethylstilbestrol liable in a product liability action for indemnification and/or contribution to a tableter of DES, i.e., a pharmaceutical company which processes the raw DES by adding various binders and other inert ingredients, makes tablets of various dosages, and packages the DES with its own directions and warnings ...?" *Id.* In finding for the bulk supplier the court stated:

DES is not inherently harmful and still is prescribed today for ailments not associated with pregnant women. Thus, it is the way in which DES is used, and not DES per se, which is harmful. Furthermore, the United States Federal [sic] Drug Administration requires the tablet manufactures and not the bulk manufactures, to account for and warn of a drug's properties. 21 U.S.C. § 355. It would therefore be anomalous to require the raw manufacturer to conduct separate tests to determine the adverse effects of the drug when by federal statute, the tablet manufacturer bears this responsibility.

*Id.*, 733 P.2d at 515. Like the drug DES, teflon has numerous appropriate uses.[11] Thus, like DES, it was not the teflon per se that was harmful, rather, its application by the intermediary.

In *White v. Weiner*, 386 Pa.Super. 111, 562 A.2d 378 (1989), the plaintiff brought action against the bulk supplier of protamine sulfate which, when administered to plaintiff's decedent, resulted in his death. *Id.*, 562 A.2d at 379–80. The court affirmed the lower court's holding that, "[a]s a matter of law Eli Lilly and Company as a bulk supplier of chemicals used in the making of prescription drugs had no duty to warn Plaintiff, Plaintiff's doctors or the manufacturer of the administered prescription drug...." *Id.*, 562 A.2d at 380. Although the courts in *White* and *George* were concerned with the bulk supplier of chemicals used in the manufacture of prescription drugs, and not the bulk supplier of raw material used in the construction of a prosthesis implant, the court views the principle as being the same.[12]

The FDA is ultimately responsible for the approval of medical devices. Further, federal law mandates that Vitek, as the designer, manufacturer and seller of the implant, is responsible for insuring that the Food and Drug Administration had the information required for it to determine that the device was reasonably safe. From the record and the briefs which the parties have provided the court, it is clear that DuPont did not have independent conclusive knowledge that Vitek's use of teflon would result in serious injury to the plaintiffs. Thus, if DuPont violated a duty to warn, it would be based on a requirement that DuPont should have conducted its own testing beyond that of Vitek and the FDA and should have discovered that the proplast device was defective. The court holds that under the undisputed facts of this case, the law does not charge DuPont with that duty.

In the bulk supplier context, courts have concluded a jury question is presented on

---

11. Defendant DuPont lists the following as common applications for Teflon: 1) bearing pads; 2) seals in Ford automobiles; 3) parts of valves; 4) quartz crystals in electronics; 5) tubing to protect wiring; 6) piston rings for use in Navy submarines; 7) self-lubricating ball bearings used in spacecraft and satellites; 8) jet aircraft carry hook-up wire and electronic wire insulated with PTFE; 9) The Vanguard I satellite used antenna insulators made with PTFE; 10) electrical parts in the airborne radar fire control system in the F–4 Phantom Jet. Defendant DuPont's Statement of Material Facts as to Which There is No Genuine Issue (John S. Lindell affidavit) (Doc. # 14) at 2–3.

12. As the court in *White* noted, federal law specifically exempts bulk suppliers of drugs from the labeling and packaging requirements of the Food, Drug and Cosmetic Act. *White,* 562 A.2d at 380 (citing 21 U.S.C. § 353 (1982)). Section 353 also specifically exempts from the labeling and packaging requirements the bulk supplier of devices. Thus, under federal law, it would appear that even if DuPont manufactured and designed the proplast implant, then sold it to Vitek for distribution, Vitek would have the obligation to provide the required warnings.

whether the bulk supplier acted reasonably in relying on the intermediary to provide the ultimate consumer with the requisite warning. The court holds that rule of law is not applicable in this case where the bulk supplier, before filling the intermediary's order informed the intermediary of its concern, but also lack of knowledge as to whether the intermediary's proposed use of teflon in medical implants was appropriate for use in medical devices. However, assuming the rule of law was applicable to the facts and circumstances of this case, the court concludes that no reasonable jury could find DuPont's actions unreasonable in light of the fact, that the FDA approved proplast material as an appropriate medical device for use in a medical implant.

The court finds on the record before it, there is no genuine issue on any material fact and concludes therefore, that DuPont, as the supplier of raw material to the FDA regulated medical device manufacturer cannot be held liable for plaintiffs' injuries based on a theory that DuPont breached a duty to warn. Defendant DuPont's motion for summary judgment of dismissal on the issues of duty as it relates to alleged negligent failure to warn, and on strict product liability is granted.

*Remaining Causes of Action*

Defendant DuPont's motion for summary judgment (Doc. # 15) seeks judgment on all plaintiffs' claims against it. The court holds that plaintiffs have not met their affirmative duty to produce affidavits or designate any part of the record that supports its claim of the presence of a material question of fact. As it relates to plaintiffs' causes of action based on negligence in the: 1) design; 2) manufacture; 3) processing; 4) marketing of the implant; 5) obtaining FDA approval; 6) promoting; 7) advertising; 8) supplying and 9) distributing and selling; the plaintiffs have not met their affirmative burden. As it relates to plaintiffs cause of action based on strict liability for placing proplast into the stream of commerce plaintiffs have likewise failed to meet their affirmative burden.

As it relates to plaintiffs' causes of action based on warranty and misrepresenta-tion, plaintiffs have not met their affirmative burden.

The court holds there is no genuine issue as to any material fact and defendant E.I. duPont de Nemours and Company is entitled as a matter of law to summary judgment of dismissal against each of the plaintiffs in each of the three cases, Civil Nos. A3–90–197, A3–91–112, and A3–91–114.

IT IS ORDERED defendant E.I. duPont de Nemours and Company's motion for summary judgment is in all respects granted, and that summary judgment be entered dismissing the claims of Jayden Veil, Gary Bracht and Tammie L. Klein against E.I. du Pont de Nemours and Company with prejudice.